Now call the case of Jemai v. Attorney General. Mr. Casazza? Yes, Your Honor. Am I pronouncing your name correctly? Yes, Your Honor. All right. Thank you. Thank you. Take your time. Get yourself set up. May it please the Court, my name is Christopher Casazza. I represent the petitioner. I am from the losses of David Piper and I would like to reserve four minutes for rebuttal. You're talking either too slowly or too fast. I apologize. Speak up. It's my first time before the Court, Your Honor. My name is Christopher Casazza. I'm the attorney for the petitioner. I'm from the losses of David Piper and I would, with the permission of the Court, I'd like to reserve four minutes for rebuttal. Very well. You have four minutes for rebuttal. I will ask you if you can speak up a little bit. Yes, Your Honor. Thank you. You have to maybe lower the mic a little bit. Sure. Okay, good. Thanks. The question before the Court is whether or not the Board of Immigration Appeals ignored evidence within the record in making their determination as to the clear error that the immigration judge allegedly committed. What is not in dispute in this case is that my client, Mr. Jumai, is a heroin addict. That was the first factual finding of the immigration judge and it has been undisturbed up until this point. And is a criminal offender. He is absolutely a criminal offender. He's been arrested 14 times in the past 10 years and four years of the past 10 years he's been incarcerated.  Yes, Your Honor. I.e. that there was evidence ignored. Your real issue, when you take that to its logical extreme, is whether the BIA did use the clearly erroneous standard or whether it decided this case de novo. That's correct, Your Honor. Not only did the Board of Immigration Appeals review the record de novo, in doing so they ignored evidence, both of which are legal and reviewable errors. So you're under Hoang v. Attorney General. That's correct, Your Honor. Where it said you can't ignore evidence favorable to the petitioner. Yes, that was also established by this court in Codner, where this court found that simply ignoring affidavits of individuals who were not testifying and were self-serving to the petitioner was a legal and reviewable error. But the BIA didn't really ignore. The BIA said that I think the main issue had to do with the issue of relapse. That's correct, Your Honor. And they said it lacks testimony from a qualified expert or documentation assessing the likelihood that a person in respondent-specific circumstances is likely to relapse. So they were saying that you really can't prove relapse by generalized information. You needed to have something more specific, and if you didn't, then your finding of a probability of likelihood more than 50 percent based upon the lack of documentation was clearly erroneous. Why is that not a correct way of reasoning? Well, as this court found in Kaplan, that one of the best predictors of future conduct is past conduct. Mr. Jemai testified credibly. He testified that he repeatedly relapsed over the past 10 years. He has an established pattern of relapse, arrest, detention, relapse. This has gone on innumerable – I tried to count. I couldn't count how many times this has happened. Why should that be a cat issue? I mean, here's somebody who says, I'm a heroin addict, and I seal, but I'm going to be poorly treated, and therefore, let me stay. Isn't there something wrong with that? Well, I think that there's something wrong in that our society has taboos against this type of behavior, but the bottom – No, but they're criminal. Sure, but the bottom line is that my client's criminal conduct is a result of his disease. He has a medical malady, which is another issue. Well, he has stayed free of addiction when he was in prison. That's correct, Your Honor, but – So we should believe him in prison? Is that the answer? No, Your Honor. That does not – because he has not been committed a crime. Well, he has committed a crime. He has committed several crimes. He admits that. That's correct, Your Honor. My client suffers from a medical condition that's not disputed in this record. If he is removed to Morocco, he will succumb to his medical condition. There will not be proper treatment for him. It's not proven on this record. I mean, the person who's the so-called expert is a professor. What does he know about addicts? Your Honor, he did not testify about addicts. You're saying the relapse aspect was something that the IJ found based upon the evidence that Jumaidi himself gave, not based upon any of his testimonies? Well, he weighed the credible testimony of my respondent, of the petitioner. He weighed his criminal record, which corroborated his credible testimony, and he weighed his background and the monumental stress that deportation would cause to my client, who has a medical condition. And in doing so, he weighed that evidence against the documentary evidence within the record, such as medical journals which make medical determinations about the impact of stress on individuals. Is he in a position to do that? I mean, he's not a medical person. He's not, Your Honor. But an expert is presented. He's not even a nurse. Well, I understand that. But an expert is needed in cases to help the finder of fact understand documentary evidence within the record. That is one of the only federal rules of evidence that has been cited by the BIA. And you're saying there's uncontroverted evidence that there's stress-induced relapse? There's a medical journal within the record, which makes the medical determination that stress not only elicits craving in addicts, in heroin addicts specifically, but also that it predicts relapse. The monumental stress that would be caused by my client being deported, losing his family, his child, his wife, his whole family from Morocco is in the United States. He would be homeless. He would undoubtedly relapse into heroin addiction. Let's go through the chain of events then, because it's not the fact that he relapses that gets you across the line with respect to a convention against torture claim. He not only has to relapse, he has to commit a crime. Correct, Your Honor. He has to commit a crime and he has to be arrested. That's correct, Your Honor. And then he has to refuse to confess.  That's correct, Your Honor. All right. Now, the question I have for you is, is it sufficient that there's a finding that it's more likely that each one of those would occur, or are we to look at it in an aggregate in terms of the probability of all those things occurring? I believe that it has to be addressed and each link of the chain of events has to be proven more than 50 percent. And that was the standard of the Board of Immigration Appeals in matter of JF. I believe it's JFF. JFF. That's correct, Your Honor. Each event my client or we had to prove. We had to prove that he was a heroin addict. The immigration judge made the factual finding that he was a heroin addict. It's uncontested at this point. If you're looking at probabilities and one item is, say, just a two-link chain, and one item has a 60 percent probability of happening, another item has a 60 percent probability of happening, the probability of both of those happening is less than 50 percent. I understand that, Your Honor, but that is not the test. That is not the test.  According to the Board's own test of precision. We didn't have an expert like you. Report to BIA. Your Honor, the fact that he would be arrested, the probability of him being arrested, the expert found that there was a 60 to 70 percent likelihood. In addition to the criminal behavior that he would have to undergo simply to feed his addiction, that is buy heroin, find heroin, use heroin, it's all illegal under Moroccan law, he would also have to feed that addiction by stealing. You know, not to interrupt you, but the expert did testify, and the IJ bought it, if you will. He testified sufficiently as to all these things after his relapse, that he would be arrested, he would be found, he would be tortured. But then the BIA says the respondent's evidence also does not prove each step. But it doesn't say we think this professor has no qualifications. So we almost can't tell what the BIA was basing its view that it wasn't proven. And I guess they can't, as you said, they can't ignore evidence. Correct. They have to deal with it. So you want us to send it back to BIA and say, okay, what is it specifically you're having a problem with from a clearly erroneous standard? That's right. The Board of Immigration Appeals, according to this court, has to give a thorough review of the record. And while they don't have to brief every single issue before them, they do have to give determinations as to why the immigration judge who relied on credible evidence, including expert testimony, why they find that that testimony and that expert is not credible. Well, it's clearly erroneous as compared to, aren't they just second-guessing? They're disagreeing. Exactly, Your Honor. And the Board of Immigration Appeals cannot overturn a decision simply because they disagree with the outcome. They have to be left with the conviction that a mistake was absolutely made. And while they can differ on the outcome, they cannot simply deny the decision and reverse the decision because they feel differently about it. I strongly believe that this decision was hastily put together because there is an extreme taboo against my client. He is a criminal. He is a heroin addict. But the fact that he's going to be- And he's using that as a reason to get into the cat room. Your Honor, I believe that it's completely established within the record that he will be tortured, that the government will torture him. Did he ever try to rid himself of the addiction? I've seen nothing in the record to show that he ever once, during all this period, and it's been a long period, tried to get help in the United States, where you can do that, assuming it- That's correct, Your Honor. He never once did. Every time he was arrested and detained, he would sober up. And once he was released, he would say, well, I can handle it this time, which I'll add is analogous to the BIA's decision. They're simply saying once he's deported, he can handle it this time. It'll be different this time. He's not going to relapse. Is he in detention now? He's currently in detention, though there's a habeas pending before the Middle District. All right. Okay. Thank you, Your Honors. Thank you very much. Mr. Nelson. Good morning. May it please the Court, Aaron Nelson for responding to the Attorney General. You're not going to tell us the Attorney General's office has lost some of its people, so you're not down? Federal. Federal government has more money than the City of Philadelphia. I think that's probably fair to say. More resources. I will say we're overstaffed, though. Your Honors, I would like to begin with the question that Judge Vanaski asked. What is the calculus on this link in the chain? As you said, if we have event one at a 60% chance and event two at a 60% chance, it's sort of like a math problem. As was formulated here by petitioner and accepted by the immigration judge, we have, depending on how you look at it, five or six links in the chain. And I believe that the matter of JFF actually does say that it is in the aggregate that we have to weigh the likelihood of all of these things happening. But that's not what the BIA did. BIA's reasoning was respondent's evidence does not prove each step and yet doesn't say, okay, what are you finding fault with? How can we conclude that they made a clearly erroneous finding when they didn't tell us, BIA doesn't tell us, what's the problem with the proof that was there? Isn't this just a de novo kind of rehash of we just don't think there's enough proof? I don't believe it is de novo. Well, then tell me how the BIA reasoned that the finding with respect to each step was clearly erroneous. I think we could just go to perhaps the most important step, which is a mistreatment that would amount to torture. They said there's no evidence. But we have an expert who opined that he would be tortured and gave a probability of 60%. Well, if you look at each place in which the expert so testifies, it's all predicated on Mr. Jemai's addiction. Well, BIA doesn't say that. I mean, I can't tell why they said this wasn't proven with respect to everything other than relapse. Relapse, I see. They wanted a specific circumstance of this person rather than a generalized this is what happens. Well, I would say that as Petitioner's Counsel indicated, they had to prove each one of those elements. Okay. So if they've not proven the relapse, if the evidence doesn't show relapse more likely than not, then they haven't proven the entirety of their case. Okay, but what if we believe that they did prove relapse, that the stress-induced, that the nature of the documentation pretty much shows this is what happens. This is stress-induced. This is a disease. This is not just, oh, I think I'm going to go have some heroin. So what if we think that that, but we don't agree with that conclusion, but then we're faced with this did not prove each step. Okay, what was it that was clearly erroneous? I don't want to argue with you. I'm just looking for the reasoning. Well, I'm not sure if when you point to the relapse, if you're saying we should posit that they didn't prove relapse or that they did show relapse. I'm positing that from the documentation and the things pointed out by Petitioner's Counsel, the perspective this is what happens to heroin addicts. There is a stress-induced relapse that has been found as a fact. That will posit that we don't have to show that a person in response to specific circumstances is likely to relapse because that's what the articles say. A person who has stress is going to relapse, and he said it would be stressful. So I'm positing, okay, I would accept his testimony as a relapse. Then I get to all the other chains, and I'd like to find a way to say, okay, well, maybe this isn't proven, but I don't know what problem the BIA had with the rest of those chains. I guess there's two things I would like to say. First is to posit what Your Honor would like to posit, as you said, you have to accept his testimony. And there's something... Which the IJ did, as credible. Absolutely, yes. And we don't have a lack of credibility. No, but there's something perverse, I think, about an individual's claim for cat protection based on the fact that I'm a heroin addict, I steal, I have refused to get treatment, even when there have been avenues for treatment. You can take issue with it, but we also have a policy that underlies cat. We don't, I mean, torture of animals, we don't like. Torture of human beings, even though they are criminals, I mean, that's what cat's all about. And if it's shown that you're going to be tortured, we will not send you to a place where you're going to be tortured. I understand, no matter how bad the conduct, that's not the inquiry. But I would say when we're talking about what is the evidence that supports this chain, you know, he has a perverse incentive to hang on to the fact that he's an addict. The point is, if this expert really knows what happens in Morocco, and it wasn't questioned, I mean, if the BIA said, you know, I don't think professors can really tell what's happening in Morocco, we don't know how long he was there, that's one thing. But it seems to me if this professor is an expert, he knows what happens in Morocco, and he said the likelihood is there, he will be arrested. He will not confess. They will view him as Americanized. He will be tortured. We have cat to protect people. Well, I guess I would say that the expert, we have an expert who's a professor of political science, who never met Petitioner. Okay, but we don't know if the BIA said that. I would have very little problem with that. But the BIA said it didn't prove. So I can't figure out why. Well, I guess you would say that, you know, in clear error review, I mean, the quote that Petitioner's counsel said, quoted, was that although there is evidence to support a finding, the reviewing body on the entire evidence is left with a definite and firm conviction that a mistake has been committed. So I think that's what happened here. What's the mistake? The mistake is that he accepted the expert as an expert? He's an expert with regard to political institutions in Morocco. The problem we're having is the BIA says the respondent's evidence also does not prove each step in the hypothetical chain concerning whether the authorities would become aware of any future heroin use and arrest him, that he would then refuse to confess his guilt, and that he thus would be tortured for the purpose of procuring his confession. But the BIA never explains what it is about the evidence that didn't prove those points. You know, we have to review the BIA decision here. We're not given a whole lot to review. But if the BIA says there wasn't evidence, then... And there is evidence, all right? There is evidence. He can't indicate anymore. We have the doctor's testimony. The expert's testimony. And it was uncontroverted. I mean, there was evidence on the other side saying this is a bunch of baloney, and that's one thing, but it was uncontroverted. Well, there's evidence of record. You know, I did an index of every time that torture is mentioned in the record in the articles of record. It has to do with political activities. It has to do with students. It has to do with those who are from Western Sahara. You know, I have five or six of these incidences where the Amnesty International report, torture continues in practice where protesters are challenging poverty, where there's national security detainees. The NPR article says that the harsh reaction by police followed a spike in violent crime. What does that demonstrate? It demonstrates that there's no evidence that someone in his shoes, a Moroccan national returning from abroad, is, you know, the captain of a ship. The BIA did not do what you just did. The BIA did not go through and say, contrary to Dr. McGruey's testimony, here's what the evidence, here's what the documentation shows, that a person in Mr. Jemai's circumstance would not be tortured, is not subject to torture. They don't torture arrestees, for example. Well, I guess I would concede it's rather circumspect on that issue. I have a question. I'm sorry? Judge Slover has a question. I'm sorry. I'm sorry. That's all right. What is the position of the Justice Department as to whether somebody can purposely, and of his or her own volition, get into CAT? In other words, we're not talking about a, I know they talk in terms of a medical condition, but this is heroin, and he steals, and these are all voluntary actions by the individual. So is a person who voluntarily does these things entitled to CAT? Well, Your Honor, I'd get in trouble if I talk about the position of the Department of Justice. You're in the Department of Justice. I can say, I tried to reference this earlier, and Judge Rendell didn't like my formulation. No, I'm just challenging you. Well, I understand, but I do think it's a fair question. We have somebody who came here, I believe, in 1999 on a B-2 visa. Usually you get six months for that. He overstayed. He married a U.S. citizen. He became a heroin addict. He committed crime after crime. He was in detention one time years ago, and it's only obliquely referred to in the record. An immigration judge obviously granted a waiver of his criminality and gave him legal permanent resident status. After that, he continues to commit crime after crime after crime. Now, of course, if they have proven that he'll be tortured, more likely than not, it doesn't matter how bad of an actor he is. But if he was to say, if I go back to Morocco, there's this person that I am under compulsion to kill, and after I kill that person I'm going to be tortured, would he be entitled to Convention Against Torture relief then? And that's the only evidence that we have. He's going to commit some horrible crime. Well, that sort of piggybacks on your question, can he get himself into it. I mean, there's an element here that feels like he's getting himself there. He is not an element. He is. Volitionally. Now, addiction is a very serious disease, but there is a volition here. And if he's granted CAT, he'll be released from immigration detention, and he's based on his record, he says, I'm going to steal. I don't know if he lives in Philadelphia or where, but get ready. So I would say what would happen in Morocco, so if we look at his initial claim for asylum protection, his 589 in the record, he was trying to piggyback on his father's successful asylum or withholding claim from a number of years ago in saying that I fear torture because my father was involved in X, Y, and Z. Well, as time went on he abandoned that. So, you know, sure, he can change horses midstream, but I think that it's suggestive that he's really willing to do anything not to go back to stay here. Could we send him somewhere? Including take heroin and steal. Absolutely. Could we send him somewhere other than Morocco? There's a possibility for that. You know, I don't, on this record, there's no accepting country. No one's going to want him. No, for him. But, I mean, that has happened. Send him to Syria. So are there any other questions? Should we be sending it back to the BIA to do the analysis? I agree with you reading the JFF, but it wasn't done by the BIA here. Or should the BIA be sending it back to the immigration judge to do the analysis the way JFF? Well, I don't think that's necessary, again, because I think that, you know, if the board was a little spartan on each one of those links, it wasn't spartan on every one of those links. And all that we have to show is that one of those links was not made. So I would say that, you know, remand is not necessary. All right. Commissioner, anything else? No. Okay. Thank you. Thank you very much. Mr. Kassaza. Thank you. Could you put down the mic? Yes. Okay. Thank you. Again, I believe that the BIA's and the government's position is based on outdated concepts of addiction. It's based on what? Outdated concepts of addiction. My client is a heroin addict, which within the record... Does he receive treatment while he's in custody? He did start attending NA while in custody. But he's not on methadone or anything like that? Well, Your Honor, the record reflects that methadone is only used to wean yourself off a drug. My client has no need for methadone. He has a need for behavioral therapies. Well, I can't follow that. I thought you said he has a need for behavioral therapy. Maybe we're getting way afield of the record. But if methadone weans you off of heroin, why wouldn't that be an accepted form of treatment? It's not a complete form of treatment, Your Honor. You're saying it weans him off, but then he relapses? That's correct, Your Honor. My client has never done methadone. He's detoxed each time by dint of being in prison. And I would imagine it's a pretty stressful place to be. It's an incredibly stressful place to be. He can't get the drugs. And saying that he could get drugs in prison is not parallel to him getting drugs on the street. He doesn't have the resources to get drugs. And the government also made the point in their briefs that there are clinics available in Morocco. These are methadone clinics. There's three of them. They have several years' long waiting lists. It's not in the BIA's decision, but it's the government's argument as to their clear error. They say that he has a perverse incentive here, that he is using his heroin addiction in order to get a second or third, really third chance in the United States. He came here when he was 15 years old because his father brought him here because of the issues he was having with the government. He remained here without a parent, and then he eventually met his current wife in high school. They got married. They have a child together. He got dental work when he was 23 years old and became addicted to OxyContin. He had never touched drugs or alcohol before in his life. Now, because he has this addiction, because he has this disease, which is described... Well, it's enough to keep calling it a disease. I'm not sure that we can accept the fact that a voluntary drug taking is a disease. I believe that it's established in the record through medical journals that it is a disease. It chemically alters the brain and, therefore, is accepted... It permanently chemically alters the brain and, therefore, is accepted as a medical condition. And he voluntarily did it. This is a voluntary addict. Well, he took opiates as prescribed to him for dental treatment. During that time, his stepfather passed away, who he was very close with, and he came to the realization that he wasn't sad or depressed when he was taking OxyContin. He was what? He wasn't sad or depressed when he was on OxyContin, and that developed into an addiction. Everybody has their story of how addiction comes. And, sure, it starts with a voluntary action of some sort, but that doesn't mean that addiction isn't a disease. And the medical evidence, the journals within the record, clearly establish that a symptom of this disease is drug-seeking behavior no matter the cost, including chronic criminal actions. Now, yes, he steals constantly, and that's only further proof that he is an addict and that he will, again, relapse. Now, what I would like this court to do is decide that Kat should be approved and not remanded because I feel like there was a bias at the lower level, and I understand that's only done in exceptional circumstances. What's our jurisdiction in this case? What are we allowed to look at? Your review is plainly, excuse me, you can review the entire record as a whole, and you can review the Board of Immigration Appeals decision. Isn't our jurisdiction limited to a narrow question of law? That's correct, Your Honor. Whether the BIA applied the wrong standard of review? That's correct, Your Honor. In evaluating the IJ's decision? That's correct, Your Honor. Okay, and what was that error of law? The error of law was that they underwent de novo review. What do you mean they underwent? Instead of reviewing for clear errors. Instead of showing deference to the immigration judge's decisions and finding clear error and articulating what those clear errors were, they instead underwent. You're very clever. You picked up on my colleagues. Thank you, Your Honor. But that has also been my argument from the beginning, so I'd like to think your colleagues adopted my argument. That's fair. Thank you. Thank you very much. And we'll call our next case. You need a break? I'm okay. You're okay? You need a break? I'm okay. We'll call the case of Lexington Insurance Company v. 3039-B.